## JACOB TILTON *v.* DAVID TILTON.

A father and son being seized as tenants in common of a farm, occupied by them jointly as a homestead, comprising two adjacent lots, one lying towards the north-west, called the "Common lot," the other towards the south-east, called "Lot No. 14," the boundary line between them being a right line running in a north-easterly and south-westerly direction, made partition of the farm by mutual releases, establishing, as the dividing line between their tracts in severalty, a line commencing on the boundary line between the lots at or near the south-east corner of the Common lot, and running in a general westerly direction, but very irregularly, at some points on one side and at others on the other side of the dividing line of the lots, to a point in the Common lot about midway between its east and west side lines, and at some considerable distance north of it; and from that point the line is described as running "south 35° east, so far that a point 55° west shall leave one half of the farm on the south-easterly side of the line and the other half on the north-westerly" — the line, as indicated by the two last courses, running across the boundary line between the lots some distance into Lot 14, and cutting off a portion of that lot, as lying on the north-westerly side of the line of partition; the father by the releases taking in severalty the part of the farm lying on the north-westerly side of this line of partition, and the son that part lying on the south-easterly side of said line. On the same day that the partition was made, the father executed his last will and testament, in and by which he devised to his two daughters each one fourth part of his homestead farm, with half of all his buildings, adding, "the one half of my farm which I have given to my two daughters I do hereby set off, and is bounded as follows," &c.; then describing a line coincident with the line of partition, from its commencement to the point midway between the side lines of the Common lot, and from that point describing a line lying wholly in the Common lot, and running to its west side line, the last course being given thus: "thence running north 34° west, so far as shall contain one half of my homestead farm in quantity;" and adding, "provided the above-mentioned line shall not contain one half of my farm as above, my will is, and I do hereby order, that my daughters shall have as much off from the north-westerly end of my land in Lot 14 as shall complete said one half. My meaning is, that my daughters shall have that part of my farm that lies north-west of said line." By the line thus described in the will, two parcels of land lying in the south-west corner of the Common lot, lying on the north-west side of the line of partition, are cut off and left on the south-east side of the line described in the will. In describing the line in the will the testator uses the expressions, " *My* barn-yard fence ;" " *my* part of the cellar ;" " *my* part of the dwelling-house ;" " the fruit trees *I* own." By the will the testator devised to the son all the residue of his estate, real and personal. *Held,* that the testator intended to devise to his daughters, as tenants in common, a definite and certain tract of land, equal in quantity to one half of that part of the farm released to him by the son, and not one half in quantity of the whole farm as it was before

the partition ; that by giving effect to it according to that intention, no rule of law was violated ; that no part of the land lying in the Common lot on the south-east side of the line described in the will, passed to the daughters, nor any of the land lying in Lot 14, except such parcels as were cut off by the irregularities in that part of the line established upon the partition between the father and son, which lies between the point of its commencement and the point midway between the side lines of the Common lot; it being proved that the land lying on the north-west side of the line described in the will was sufficient in quantity to make up one half of the land held by the father in severalty after the petition.

THE facts in the case sufficiently appear from the opinion of the court.

*Bell*, for the demandant.

*E. A. Hibbard*, for the tenant.

SAWYER, J. This is a writ of entry, brought to recover possession of a tract of land situate in New-Hampton, comprising the Common lot and part of Lot 14, in the third range. The tenant disclaims all that part of the demanded premises which lies on the north-west side of an irregular line, described as beginning at a point in the dividing line between said lots at what is claimed to be the south-east corner of the Common lot, and as running in its general direction along the course of this dividing line, at some points falling below it, and thus including within the premises disclaimed small portions of Lot 14, and at others passing to the other side of it, and thus excluding portions of the Common lot, and terminating at the west side line of the Common lot at a point a little north of its south-west corner. The Common lot lies towards the north-west, and Lot 14 towards the south-east, the boundary line between the lots being a straight line running in a north-easterly and south-westerly direction. The land thus disclaimed is mainly the Common lot — this irregular line being substituted as the southerly limit of the land disclaimed, instead of the right line which constitutes the true boundary between the lots. As to the residue of the demanded premises, the tenant pleads the general issue.

No evidence of title was offered on the part of the tenant, but he, being in possession of that part of the demanded premises not disclaimed, is not to be disturbed in his possession unless the demandant makes out a *prima facie* title to the whole, or some portion of that part of the demanded premises the title to which is put in issue by the plea of *nul disseizin;* that is to say, that part which lies south-east of the irregular line constituting mainly Lot 14, with the addition thereto of such portions of the Common lot as are cut off by the irregularities of the line described in the disclaimer.

The demandant makes out a title in himself to an estate for life in such lands as were devised to Rachel and Jemima Tilton by the will of their deceased father, David Tilton ; and the question raised by the case is, whether the whole or any part of the land in controversy, that is to say, the land which lies on the southeast side of this irregular line, passed by the will of said David Tilton, deceased, to his daughters, Rachel and Jemima. The clause in the will upon which the question depends is as follows : " I give and devise to my daughters, Rachel and Jemima Tilton, each one fourth part of my homestead farm, with half of all my buildings, to hold to them and their heirs. The one half of my farm which I have given to my said daughters I do hereby set off, and is bounded as follows : beginning at a stake and stones," &c., and then proceeding to describe the said irregular line through its whole course, as contended by the tenant, to its termination in the west side line of the Common lot, but, as the demandant contends, to a point a little short of its termination. The doubt or uncertainty as to the point where the line, according to the description in the will, terminates, arises from the manner of describing the last course in the line before arriving at that termination. It is as follows : " thence about southwesterly up the brook, running about two rods north of the bridge on said brook." The point two rods north of the bridge, is the point at which, as the demandant contends, the line described in the will terminates, and it is on the line, as described in the disclaimer, continuing it on the same course through this

point, two rods north of the bridge, to the west line of the Common lot, will carry it to the same termination, and render it in all respects identical with that line.

In describing the various courses and angles of this line the following expressions are used: "the corner of *my* barn-yard fence;" "*my* part of the cellar;" "the fruit trees I own, near the back side of my part of the dwelling-house;" and one of the courses of the line is described thus: "thence on the orchard fence until it passes three rows of apple trees in my part of the orchard, and ten feet more."

From the point at which the line terminates, whether it be considered, as contended by the demandant, or at the other point further west, to which the tenant claims it to extend, the will proceeds to add the following as a continuation of the line described in the disclaimer: "Thence running north, 34° west, so far as shall contain one half of my homestead farm in quantity;" and the following provisions are then inserted: "Provided the above-mentioned line shall not contain one half of my farm, as above, my will is, and I do hereby order, that my said daughters shall have as much off from the north-westerly end of my land in Lot 14 as shall complete said one half. My meaning is, that my said daughters shall have that part of my farm which lies north-west of the above line." The testator then devises all the residue and remainder of his homestead farm, and of his estate, real and personal, to his son, Green Tilton. The will was made on the 20th of January, 1804. Prior to and down to that day said David Tilton and his son Green had owned the whole premises, including both lots, as tenants in common, each of one undivided half part, and had lived together upon them. On that day partition was made between them of their common estate, by deeds of release from one to the other, by which the father quitclaimed to the son all right in that part of the farm which lies on the south-easterly side of a line which, from the point of commencement of the line in the disclaimer, to a point about midway across the Common lot, is identical with it, and there turning southerly, is described, from that point, as

follows : " Thence running south, 35° east, so far that a point 55° west shall leave one half of the farm on the south-easterly side of the line, and the other half on the north-westerly ; meaning to convey all my land on the south-easterly side of the above described line to said Green Tilton ;" and the son quitclaimed to the father all the land lying north-westerly of the same line. The line, as described by the two last courses, runs across the boundary line between the two lots, some considerable distance into Lot 14, and then turning to the west and running to the west side line of the lot, cuts off a portion of that lot, as lying on the north-westerly side of the line ; and as the point in the Common lot, from which this continuation of the line of partition diverges from the line described in the will, is at some considerable distance from the boundary line between the lots, there are left two parcels, one of them being of considerable extent, in the south-west corner of the Common lot, which do not pass to the son by the release, nor to the daughters by the will.

It was admitted at the trial that the land disclaimed exceeds in quantity the one half of the land owned in severalty by the father, after the execution of the deeds of release establishing the partition.

It was proved at the trial that Rachel and Jemima occupied the premises disclaimed, under the will of their father, for about thirty years, until their decease, and that Green Tilton and the tenant after him occupied the residue of the demanded premises uninterruptedly from the death of the father. Other facts appeared on the trial in relation to statements made by the tenant in 1851, relative to his having land in his possession belonging to the demandant, and relative to acts done by the demandant in cutting wood from the land claimed by him in Lot 14, and in relation to a running out and surveying of the lots by him in 1845 ; but under the views of the case entertained by the court there, as well as the fact that some uncertainty exists as to the point of commencement and termination at or near the west side line of the lot, of the line described in the will, are immaterial to be considered, as there is no claim set up by either party

under an adverse possession, and they are not facts of a character to have any legitimate bearing upon the question, what is the true construction to be given to the will of said David Tilton ? The demandant claims that by the devise to Rachel and Jemima Tilton the whole of that half of the farm passed which on the partition between said David and Green was quitclaimed by the son to the father, unless the two parcels in the south-west corner of the Common lot should be excluded : That by the words, " my homestead farm," a certain half of which, bounded and described as set out in the will, he was giving to his two daughters, the testator intended the whole farm as it was before the division ; and consequently that by the words, " the one half of my farm which I hereby set off," he meant the land lying north-west of the irregular line described in the will and in the disclaimer, with so much more added to it from off the north-west end of that part of Lot 14 which was not quitclaimed to Green as would be required to make out one half in quantity of the farm as occupied by him with his son prior to the partition ; in other words, that by the one half of his farm which he set off to his daughters, he meant the one half which his son had that day quitclaimed to him, excepting the two parcels in the corner of the Common lot. These two parcels, though quitclaimed by the son, could under no circumstances and in no view of the case, pass by the will to the daughters, inasmuch as they do not lie on the N. W. side of the irregular line described in the will, and therefore cannot pass under that clause in the devise which gives the part of the farm lying on the north-west side of that line, and are not a part of Lot 14, and consequently cannot pass under the other provision that if the part north-west of that line is not half in quantity of the farm, the deficiency is to be made up by taking off so much as may be necessary from the north-west end of the testator's land in Lot 14. The demandant also contends that it should be submitted to the jury to find whether the said David, the testator, intended to devise the whole of the half quitclaimed by Green, with those exceptions. On the other hand, the tenant claims that the devise was only of the one half

of the land held in severalty by said David after the execution of the quitclaim deeds, and that in fact the land disclaimed being more than half in quantity of the land so held in severalty, no land is required to be taken from Lot 14 to make up that half, and consequently no part of the land the title to which is put in issue by the pleadings, passed to the daughters by the will.

The construction to be given to the will is to be such as will carry into effect the intention of the testator, if it may be done consistently with rules of law. That intention, however, is to be gathered from the instrument itself. For that purpose, all its provisions are to be considered in connection, and read and interpreted together. The intention to be gathered from thus considering it is not, however, a question of fact, to be passed upon by a jury, but a legal conclusion, to be drawn by the court. In giving it a construction, it is to be read, as it is sometimes expressed, in the light of the surrounding circumstances. The language used by the testator is to be considered in connection with the facts which may be supposed to have been before his mind at the time, and in reference to which it must be supposed the instrument was framed. The title of the father and son to the premises, their mode of occupation, the releases executed between them, and the relation in which they stood to each other and to the two female devisees, are facts of that character, and may be of material import in attempting to ascertain the meaning of the testator in the language which he has used. The devise to Rachel and Jemima each of one fourth part of the testator's homestead farm, standing by itself, with no other expression in the will to control it or to be construed with it, would undoubtedly give to each an undivided fourth part of the farm, whatever the farm might be that was meant, constituting them tenants in common each of one fourth part through the entire farm. But the expression here used is controlled by other provisions. The one half which is thus given to the daughters, made up of one fourth to each, is declared to be a tract severed from the other part, and described by metes and bounds, being all of the farm lying on one side of a particu-

lar line in the Common lot, and so much more land taken from another part, to wit, Lot 14, as may be necessary, using the language of the testator, to complete one half of the farm in quantity. As this tract, so set out, passed by the will to the two daughters, severed from the other half, they would each be tenants in common of an undivided half of that tract, thus satisfying the terms of the will by becoming each the holder of one fourth of the farm, and at the same time the two together holding the half so set off and bounded, as tenants in common. Whether the line described as the boundary of the tract in the Common lot, in fact terminates at a point short of the west side line of the lot, or extends entirely across the lot, it is unnecessary to consider, as the parties, having adverse interests under the will, have given a construction to it in this particular for themselves, by an occupation of more than thirty years, in accordance with the view that it extended across the entire lot; and all controversy upon that point, if not precluded by such acquiescence, is now put at rest by the disclaimer.

The question then arises, of what farm did the testator intend that this tract should be the one half? Of the farm as it was before the partition, or of his land set off to him in severalty on the partition? And it is very clear, from various considerations, all tending to the same conclusion, that it was the latter—the farm of which he became the sole owner by the partition.

The expressions used, " *my* part of the dwelling-house," &c., indicate clearly that the testator had before his mind the division which had been made, or in which the parties were engaged at the time, as a part of the transaction in making a final disposition of his estate. It is hardly to be credited that, under the circumstances, he should speak of the whole farm, one half of which had just then been released by him to his son in severalty, as " my homestead farm." He had indeed occupied in conjunction with his son the whole farm as his homestead, but the arrangement between them for the division of the estate, and for holding in severalty thereafter, that day made, was a transaction of too important a character not to have been fully in his mind

Tilton v. Tilton.

in the further equally important transaction of making a testamentary disposition of his estate. If it had been his intention to give to his daughters the same half which had just been established between himself and his son, as his share of the whole farm, or that half, with the exception of the two parcels in the corner of the Common lot, a very simple and intelligible form of expression would have been suggested by the proceedings in making the partition, viz., " that part of the farm which had that day been released to him by his son;" or that part with those exceptions. To hold that, by the half of the farm given to his daughters, he intended a tract made up of all of the farm lying on the north-west side of the line described in the will, and so much added thereto from the north-west end of his part of Lot 14 as would be necessary to make up one half of the farm as it was before the division, would be to hold that he intended a thing which the facts show was impossible to be done, and which, from the division then made, he must be understood to know was impossible. There was not land enough of his in Lot 14, taking all the land he owned therein after the division, and adding it to the land lying north-west of the line described in the will, to amount in quantity to the one half which, on this supposition, he was giving to his daughters. All that he owned in Lot 14 was so much as was necessary, when added to that which was quitclaimed to him in the Common lot, to make just one half of the original farm. To that quantity the description in the quitclaim is expressly limited. As two parcels of some considerable extent, lying in the south-west corner of the Common lot, quitclaimed by the son, and thus contributing to make up the half to which the quitclaim is limited, but not lying on the north-west side of the line described in the will, nor in Lot 14, and so not contributing in any view to make up the half given by the will to the daughters, it necessarily follows that more land would be required in Lot 14 to make up the half so given to the daughters, than the testator owned in that lot. That this should be the result of carelessness or mistake, is irreconcilable with the care and attention in other respects manifested in

the arrangements made for a final disposition of his estate. That the will is the work of one unskilled in the business of drawing up instruments of this character, is quite apparent; but though inartificially drawn, it evinces carefulness, consideration, and intelligent purpose. The testator had that day made, or was making simultaneously, a division of the farm between himself and son, and a testamentary disposition of his property. In the division precisely one half of the farm in quantity is assigned to him as his share. On the theory which the demandant sets up, he attempted to devise by his will that same half to his daughters, or that same half, with the exception of the two parcels; but by a mistake which it is difficult to account for, he omitted the two tracts; or, intending to devise all of that half except the two tracts, he omitted them by design, but by another equally inexplicable blunder he used such terms in making the devise as gave land enough in Lot 14 to make up the full half, when, by reason of that omission, he had not land enough in Lot 14 to make it up.

Another provision of the will is equally inconsistent with the theory set up by the demandants. The land lying on the northwest side of the line described in the will, contains about one fourth part of the number of acres contained in the whole farm before the division. In the devise to the daughters the testator carefully provides that the boundary line of the land given to them shall be so drawn as not to contain more than one half of his farm; which, upon the demandant's theory, is the whole original farm, of which it contained but one fourth. It can hardly be supposed that he was so ignorant of the extent of his homestead, or of the different tracts of which it was composed, and especially of this particular tract, the extent of which he had occasion to estimate in connection with the division between him and his son, as to deem it necessary to provide in the will for the contingency of its turning out to measure more than half of the whole farm, when in fact it measured but one fourth.

These objections to the construction contended for by the demandant are obviated by that which the tenant claims as the true construction of the will. That the testator should designate

the tract which had that day been assigned to him as his share in the common estate as his homestead farm, was not, perhaps, so appropriate as some other form of expression. But to construe it as meaning this does no greater violence to the language than to construe the phrase, " my homestead farm," as meaning the farm which, in one sense, was not his, but his and his son's in common. In giving it this construction, full effect is given to the cautious provision inserted for securing to the daughters precisely one half of the farm, and which, upon the other construction, are unmeaning, or impossible to be executed. Upon this construction the testator divides his share of the farm into two parcels, as nearly equal as may be without actual mensuration, giving one to his two daughters in common, and the other to his son; — provides for a correction of the error, if, on actual mensuration, it should be found that error existed either way; and because it was probable that there might be error in one direction or the other, but uncertain in which, prescribes a mode for correcting the error which is practicable in either event, and which would produce the precise result intended, by giving an exact half to the daughters. Upon this construction the provisions of the will become consistent with each other, and with the facts before the testator at the time of its execution, and the construction is quite as well sustained by the phraseology as any other than can be given to it. The verdict was properly ordered for the tenant, and judgment must be rendered thereon.